733 F.2d 1403
 HIBERNIA NATIONAL BANK in New Orleans, a National Banking
Association, Plaintiff-Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, a National
Corporation; Deposit Insurance National Bank of Oklahoma
City, a National Banking Association and James Hudson, an
individual employee of FDIC, Defendants-Appellees.
 No. 83-1557.
 United States Court of Appeals,
Tenth Circuit.
 May 9, 1984.
 
 G. Wynn Smith, Jr., Memphis, Tenn. (Mark Vorder Bruegge, Jr., of Wildman, Harrold, Allen, Dixon & McDonnell, Memphis, Tenn., Chester L. Armstrong, Jr., of Armstrong, Burns, Baumert & Cummings, Ponca City, Okl. and Robert G. Coury, Gen. Counsel, Hibernia Nat. Bank in New Orleans, La., with him on briefs) of Wildman, Harrold, Allen, Dixon & McDonnell, Memphis, Tenn., for plaintiff-appellant.
 Oliver S. Howard, Tulsa, Okl. (Charles C. Baker and Sidney G. Dunagan of Gable & Gotwals, Tulsa, Okl. and Donald B. McKinley of The Federal Deposit Ins. Corp., Washington, D.C., with him on brief) of Gable & Gotwals, Tulsa, Okl., for defendants-appellees.
 Before BARRETT, DOYLE and LOGAN, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 This is an appeal under 28 U.S.C. Sec. 1292(a)(1) from an order of the district court, acting on cross-motions, granting a preliminary injunction in favor of defendants-appellees (hereinafter jointly referred to as Federal Deposit Insurance Corporation or FDIC) and denying preliminary injunctive relief to plaintiff-appellant, Hibernia National Bank in New Orleans (Hibernia). Hibernia sought status as a preferred claimant against the assets of the FDIC, which was serving as receiver for the insolvent Penn Square Bank, N.A. (Penn Square) of Oklahoma City, Oklahoma. FDIC was appointed receiver by the Comptroller of the Currency pursuant to 12 U.S.C. Secs. 192 and 1821(c). A recitation of relevant, undisputed facts follows.
 
 
 2
 On July 5, 1982, the Comptroller of the Currency declared Penn Square insolvent and appointed the FDIC as receiver. Defendant-Appellee, James Hudson, is the FDIC employee acting as chief Penn Square liquidator. Among the possessions of Penn Square which came into the FDIC's possession as receiver were certain promissory notes and other documents evidencing some eighty-four (84) loans transacted by Penn Square with third-party customers. At or after the original making of each loan, Penn Square sold a "participating" interest of between 47% and 100% to Hibernia. These transactions were undertaken because the loans were larger than Penn Square could accommodate from its economic resources or larger than the amounts of indebtedness Penn Square could assume from a single borrower under the National Bank Act, 12 U.S.C. Secs. 21 et seq.
 
 
 3
 Hibernia purchased eighteen (18) participations (Ex. 5) in loans from Penn Square pursuant to "certificates of participation." See Appendix A. These participations totalled approximately $17,937,545.00. Under the certificates of participation, Penn Square retained all the original loan documents including the notes, continued to service the loans, and remitted to Hibernia its portion of all payments and collections in accordance with Hibernia's percentage of ownership. In each instance, the only note evidencing a creditor-debtor relationship was the original note, executed between Penn Square and the borrower, and held by Penn Square. Of the fourteen borrowers for the Ex. 5 loans, apparently only two were aware that 100% of their debts would be "assigned and sold" to Hibernia and that Hibernia would actually fund 100% of the loans (R., Vol. II, Pl.Ex. 1, p. 2).
 
 
 4
 Hibernia also purchased sixty-six (66) participations (Ex. 6) in loans totalling $8,461,953.00 which were evidenced by certificates of participation and a "loan pool purchase agreement." Although Hibernia continued to hold the original loan documents to service these loans, the Ex. 6 loans were different because "[I]n many cases, Hibernia contacted the borrowers, interviewed them and reviewed their financial statements prior to [deciding which loans would be] ... included in the loan pool" (R., Vol. 1 at p. 381). Also, "most, if not all the borrowers had actual notice of Hibernia's participation in the loan pool." Id. Furthermore, all the Ex. 6 loans had been outstanding for a minimum of six months at the time they were pooled. Finally, and perhaps most important, the loan pool purchase agreement specifically provided in section 6.01:
 
 
 5
 In the event that (i) the Seller [Penn Square] shall become insolvent ... the Purchaser [Hibernia] shall have the right to purchase the remaining interest held by the Seller in ... all of the Loans, for a price equal to the Seller's share of such Loans; provided, however, that the Purchaser shall have given the Seller at least ten (10) days prior notice thereof. Upon the exercise by the Purchaser of its rights hereunder, the Seller shall immediately deliver to the Purchaser all Notes and Loan Documents.
 
 
 6
 R., Pl's Ex. 4 at p. 13.
 
 
 7
 After Penn Square was declared insolvent on July 5, 1982, and the FDIC had assumed control of operations, it (FDIC) advised the Ex. 5 and Ex. 6 loan borrowers, who also had kept deposits at Penn Square, that they had a right to collect their deposit claims by "offsetting" them against their indebtedness on the participated loans. On July 19, 1982, however, Hibernia notified the Ex. 5 and Ex. 6 loan borrowers:
 
 
 8
 The purpose of this letter is to confirm our telephone call to you by which we gave you official notification that ... your debt to Penn Square Bank of Oklahoma City was formally assigned to Hibernia National Bank in New Orleans ... Hibernia National Bank is looking directly to you for payment of the portion of the above mentioned debt which has been assigned to it by Penn Square Bank. Because of the insolvency, neither Penn Square Bank nor its successor Deposit Insurance National Bank nor the Federal Deposit Insurance Corporation is authorized to accept any payments, effect any settlements, or effectuate any reduction whatsoever in the portion of the debt assigned to Hibernia National Bank and owed by you directly to Hibernia National Bank, either by compromise settlement, set off, or any other means. In view of the fact that Hibernia is looking directly to you for payment on this portion of the debt, any payment made or settlements effected with Penn Square National Bank, Deposit Insurance National Bank or the Federal Deposit Insurance Corporation, as receiver, will not be considered by Hibernia as a reduction on the portion of your debt assigned to it and, to the extent such payments, set off, or other settlements are attempted with Penn Square or the Federal Deposit Insurance Corporation by you, you will find yourself called upon by Hibernia National Bank to make duplicate payments to it, notwithstanding such prior payments or arrangements with Penn Square or the Federal Deposit Insurance Corporation. Hibernia will indemnify you to the extent of any loan payments made by you directly to Hibernia on your loan to Hibernia.
 
 
 9
 R., Pl's Exh. 7.
 
 
 10
 During the course of a motion hearing, Hibernia acknowledged that it was "not familiar with" any documents which gave it the right to demand full payment on the loans (R., Vol. III at pp. 151-153). Hibernia further acknowledged that it was unaware of any participated loans which were in default at the time it wrote the letter (R., Vol. III at p. 140) and that after it sent the letter, many of the loans went into default and many of the borrowers were confused as to who they should pay (R., Vol. III at pp. 100, 116, and 150).
 
 
 11
 Hibernia initiated this action by filing a motion for a preliminary injunction seeking to enjoin the FDIC from attempting to effectuate offsets against the Ex. 5 and 6 loans and to cause the FDIC to deliver over to it all documents evidencing the Ex. 5 and 6 loans and all security therefor. In an amended and supplemental motion, Hibernia requested that the FDIC be enjoined from threatening or inducing any of the Ex. 5 and 6 loan borrowers to take, or to refrain from taking any action relative to their loans participated in by Hibernia.
 
 
 12
 Within its answer and counterclaim, the FDIC moved for a preliminary injunction to restrain Hibernia from advising the Ex. 5 and 6 loan borrowers that it (Hibernia) had the right to collect all or a proportionate amount of their loans. The FDIC further sought to enjoin Hibernia from attempting any collection of the participated loans and to cause Hibernia to notify all Ex. 5 and 6 loan borrowers that all further correspondence and activities relative to their respective loans be with the FDIC.
 
 
 13
 Within its order, the district court concluded that pursuant to its earlier decision in Chase Manhattan Bank, N.A. v. Federal Deposit Insurance Corp., 554 F.Supp. 251 (W.D.Okl.1983), the Ex. 5 loan borrowers could offset any of their deposits in Penn Square against any debts owing Penn Square at the time it was deemed insolvent, including those debts participated in by Hibernia. In regard to the Ex. 6 loans, however, the court found that the loan pool purchase agreement created an agency between Penn Square and Hibernia and that in the event of Penn Square's insolvency Hibernia had the right under section 6.01 of the loan pool purchase agreement to purchase the Ex. 6 loans collateralizing the agreement.
 
 
 14
 The district court thus denied Hibernia's request that the FDIC be enjoined from effectuating offsets against the Ex. 5 loans and, granted the FDIC's request that Hibernia cease attempting collection or making demand on Ex. 5 loan borrowers or in any way interfering with the right of the FDIC in the loans. The court directed Hibernia to immediately notify all Ex. 5 loan borrowers it had previously contacted that all further communications and activities relative to said loans be with the FDIC as receiver for Penn Square. The court granted Hibernia's preliminary injunction insofar as it requested that the FDIC be enjoined from attempting to effectuate offsets of the deposit accounts in Penn Square of the Ex. 6 loan borrowers against the Ex. 6 loans.
 
 
 15
 On appeal, Hibernia contends that the single legal question before us is whether Penn Square's participation to Hibernia of part or all of the Ex. 5 loans transferred ownership in such loans to Hibernia. Although the FDIC contended during the course of oral argument that the district court erroneously ruled on the Ex. 6 loans evidenced by the loan pool purchase agreement, neither party formally challenges the district court's rulings in this respect on appeal.
 
 
 16
 Within its complaint, Hibernia characterized the participations with Penn Square as "assignments without recourse of portions of said loans" (R., Vol. I at p. 3). During the motion hearing arguments to the district court Hibernia also contended "if the court reviews these documents, the only thing they could be characterized as is an assignment of a debt or a portion of the debt, plus an agency" (R., Vol. IV at p. 45).
 
 
 17
 Notwithstanding these representations, Hibernia now contends on appeal that the participation agreements transferred the ownership of the participated portion of each loan to it (Appellant's Brief at pp. 12, 15 and 17). Hibernia further contends that since the participations transferred the ownership of the loans, the court erred in allowing the FDIC to effectuate offsets against the participated portions of the Ex. 5 loans.
 
 
 18
 Although nothing in the participations agreement indicates that the participations were anything other than "assignments without recourse" coupled with agency, Hibernia contends that it intended and treated each participation as a transfer of ownership, and that, accordingly, the FDIC could not offset the Ex. 5 loan borrowers deposits against the participated portions of the loans. We disagree.
 
 
 19
 In a typical participation, the "lead" (Penn Square) divides large loans into shares which it then offers for sale to other participating financial institutions (Hibernia). The lead is the only secured party. The "participants" can look solely to the lead for satisfaction of their claims because they are not themselves creditors of the borrowers and cannot assert creditor claims against the borrowers. See Armstrong, The Developing Law of Participation Agreements, The Business Lawyer, Vol. 23, No. 3, pp. 689-90, 692-94 (April 1968).
 
 
 20
 The FDIC, when acting as a receiver for an insolvent bank, cannot prefer some creditors over others; rather, all creditors must share in a ratable distribution of the insolvent bank's assets. First Empire Bank v. Federal Deposit Insurance Corporation, 572 F.2d 1361 (9th Cir.1978), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). Furthermore, a party, such as Hibernia, seeking to impress a trust on an insolvent bank's assets (here, by precluding offsets), must first establish a fiduciary relationship and thereafter trace the trust property in its original or converted form into identifiable property in the receiver's possession. Kershaw v. Jenkins, 71 F.2d 647 (10th Cir.1934).
 
 
 21
 On the other hand, a depositor-creditor's right of set-off is fixed at the moment of a bank's insolvency. Dakin v. Bayly, 290 U.S. 143, 148, 54 S.Ct. 113, 115, 78 L.Ed. 229 (1933); Davis v. Elmira Bank, 161 U.S. 275, 290, 16 S.Ct. 502, 506, 40 L.Ed.2d 700 (1896). The right to set-off exists, however, only when the bank and the depositor are in a debtor-creditor relationship, Navajo Tribe v. Bank of New Mexico, 700 F.2d 1285 (10th Cir.1983). Significantly, "it is only the balance, if any, after the set-off is deducted which can justly be held to form part of the assets of the insolvent [bank]." Scott v. Armstrong, 146 U.S. 499, 510, 13 S.Ct. 148, 151, 36 L.Ed. 1059 (1892); First Empire Bank, N.Y. v. Federal Deposit Insurance Corporation, 634 F.2d 1222 (9th Cir.1980); Federal Deposit Insurance Corporation v. Mademoiselle of California, 379 F.2d 660 (9th Cir.1967). See also Federal Deposit Insurance Corporation v. Bank of America, 701 F.2d 831 (9th Cir.1983), (bank has a right to set-off a debt it owes even though, to the extent of the set-off, the set-off can be said to prefer the offsetting bank to the creditors of the debtor). The distribution of the assets of an insolvent bank must, of necessity, come "from what belongs to the bank, and that which at the time of insolvency belongs of right to the debtor does not belong to the bank." Scott v. Armstrong, supra 146 U.S. at 510, 13 S.Ct. at 151. In Bromfield v. Trinidad National Investment Co., 36 F.2d 646, 648 (10th Cir.1929), we stated:
 
 
 22
 It has been settled ever since the decision of Scott v. Armstrong in 1892 ... that a receiver of a national bank, when suing the maker of a note to the bank, must set off the amount of the maker's deposit, without an express agreement. Without an express agreement, a receiver may not set off one man's deposit on another man's note.
 
 
 23
 We hold that the district court correctly found that the right of offset for the Ex. 5 loan borrower-depositors was appropriate and that it extended to the loans participated in by Hibernia. The district court properly relied on its decision in Chase Manhattan Bank, N.A. v. Federal Deposit Insurance Corporation, supra, wherein it adopted Federal Deposit Insurance Corporation v. Mademoiselle of California, supra, as follows:
 
 
 24
 In Mademoiselle the Court noted that a participating bank may establish a right to recovery against the receiver in preference to the general pro rata distribution of assets "in situations where the facts are such that the court must say in equity that the property is not that of the bank but that of the claimant." Citing John L. Walker Co. v. Alden, 6 F.Supp. 262, 267 (E.D.Ill.1934). In this regard the claimant "has a heavy burden of proof, and unless he clearly and certainly identifies the fund he must fail." Converse Rubber Co. v. Boston-Continental Nat'l. Bank, 12 F.Supp. 887, 893 (D.Mass.1935), aff'd 87 F.2d 8 (1st Cir.1936). Thus the participating bank must be able to identify a specific fund or payment in the possession of the receiver cognizable in equity as the participating bank's own property.
 
 
 25
 In other words if a depositor made a specific payment on the loan which "augmented" the assets of Penn Square Bank or the receiver FDIC the participating bank might establish a preferred claim. However an offset is not a payment but merely a setting-off against the loan of previously established credits. Under Mademoiselle, such an offset is insufficient to establish a fund which the claimant may call its own. An offset is a bookkeeping transaction or "a mere shifting of credits". By its very nature an offset cannot augment the receiver's estate.
 
 
 26
 554 F.Supp. at p. 251 (emphasis added).
 
 
 27
 Hibernia has failed to identify a specific fund in the possession of the FDIC as Penn Square's receiver "cognizable in equity as--[Hibernia's]--own property." Furthermore, because an offset cannot augment a receiver's estate, and it is only the balance, if any, after the offset which forms an asset of the insolvent, Hibernia's request that the FDIC be enjoined from effectuating offsets relative to the Ex. 5 loans must fail.
 
 
 28
 Nothing in the participation agreements, which govern the participation relationship, Franklin v. Commissioner of Internal Revenue, 683 F.2d 125 (5th Cir.1982), was in derogation of the borrower-depositors' offset rights. The agreement, as we have noted, cannot be read to transfer the ownership of the loans to Hibernia. Nor are we able to read into the participation agreements Hibernia's proposition that its treatment and intent should control on this issue. Hibernia is, in our view, attempting to rewrite the participation agreements in order to afford it the ability to enjoin the borrower-depositors' established right of offset. We cannot rewrite the participation agreements for Hibernia's benefit.
 
 
 29
 A final observation relating to a matter not raised on appeal is in order. In granting Hibernia's requested injunctive relief, the district court enjoined the FDIC from attempting to effectuate offsets of the deposit accounts of the borrowers in Penn Square Bank against the loans reflected in Exhibit 6 (R., Vol. I at p. 383). This relief does not, in our view, preclude the FDIC from attempting to effectuate offsets of the deposit accounts of the borrowers in Penn Square Bank against any other Penn Square Bank loans of the borrowers. To hold otherwise, would be in derogation of the borrowers' offset rights. See Scott v. Armstrong, supra; Bromfield v. Trinidad National Investment Co., supra.
 
 WE AFFIRM.APPENDIX A
 CERTIFICATE NO.__________ NOTE
 NO.__________ Duplicate
 CERTIFICATE OF PARTICIPATION
 
 30
 Penn Square Bank N.A.
 
 Oklahoma City
 TO:
 DATE ______
 
 31
 WE ACKNOWLEDGE RECEIPT of $______ in payment of your participation in that amount in a loan of $______ made to __________, evidenced by a note dated ________ due ________ with interest at ____ per cent per annum, payable __________.
 
 
 32
 So that you will have a complete description of the subject loan, we are attaching hereto a true copy of the note and a true copy or a description of all security taken by us.
 
 
 33
 We hereby confirm that in consideration of your payment to us, we are holding for your account a pro rata interest in the unpaid principal of the subject note, together with the same proportionate interest in any and all interest to accrue on the note from and after due date, and in any and all collateral securing the same, together with any guaranties thereof.
 
 
 34
 It is expressly understood that we do not make any representations or assume any responsibility with respect to the validity, genuineness or collectibility of said note, or the collateral securing the same, or guaranties thereof, and that we are entitled to use our discretion with respect to exercising or refraining from exercising any rights, or taking or refraining from taking any actions which may be vested in us, or which we may be entitled to take or assert under the terms of our note and that, although we will exercise the same care to protect your interest as we do to protect our own, we shall not, so long as we exercise such care, be under any liability to you with respect to anything which we may do or refrain from doing in the exercise of our judgment or which may seem to us to be necessary or desirable in the premises. We reserve the right to release collateral and to permit substitutions of new collateral.
 
 
 35
 This participation may not be assigned or transferred in whole or in part without our prior written consent. Also it is the understanding that we shall have the exclusive option and privilege of repurchasing this entire participation at any time by paying to you your pro rata share of the unpaid principal and accrued interest or less unearned discount, as the case may be.
 
 
 36
 We further understand that you will reimburse us in proportion to your participation in this loan for all expenses, attorneys fees, and other liabilities incurred by us in connection with this loan.
 
 
 37
 Kindly indicate your acceptance of this participation upon the conditions outlined above on the enclosed copy of this participation and return it to us.
 
 
 38
 Sincerely,
 
 ACCEPTED: PENN SQUARE
 
 39
 BANK N.A.
 
 Oklahoma City
 
 
 By _______________
 
 
 
 40
 LOGAN, Circuit Judge, concurring in part and dissenting in part:
 
 
 41
 I agree with the majority's conclusion that Hibernia National Bank may not enjoin the Federal Deposit Insurance Corporation receiver from permitting a depositor in the Penn Square Bank to offset account balances against outstanding loan balances he or she has with the bank, including loans in which Hibernia bought participations. I also agree that the FDIC receiver may continue to collect on loans in which Penn Square has an ownership interest. However, I disagree with the majority's characterization of Hibernia's rights in the participations.
 
 
 42
 In purchasing participations in Penn Square loans Hibernia assumed the risk of insolvency of the borrower to the extent of the percentage of the loan Hibernia acquired. Penn Square acted, as to the portion assigned to Hibernia, as Hibernia's agent with the responsibility to collect and remit Hibernia's portion of the payments made by the borrower. To be sure, Penn Square retained rights to release collateral and permit substitutions of new collateral and to repurchase the loans. But these rights do not make Hibernia a mere creditor of Penn Square. I am satisfied that the participations constitute assignments of ownership of the loans to Hibernia to the extent of the percentages it acquired. SBA v. McClellan, 364 U.S. 446, 81 S.Ct. 191, 5 L.Ed.2d 200 (1960); FDIC v. Mademoiselle of California, 379 F.2d 660, 665 (9th Cir.1967).
 
 
 43
 As the majority recognizes, the borrower-depositor in Penn Square may offset the balance in his bank account with the insolvent bank against any debt the depositor owes to the bank. If the depositor chooses to offset against a loan in which Hibernia has participated, the offset should first apply to that portion of the loan retained by Penn Square. If the amount of the offset exceeds the portion of the loan retained by the insolvent bank, Hibernia does not become a preferred claimant as to the excess. Id. at 665. However, because of Hibernia's ownership interest in the loan to the extent of its participation, Hibernia does become a general creditor of Penn Square as to that amount.[1] For the same reason, any future payments on the loan in excess of Penn Square's interest should pass directly to Hibernia. Hibernia simply is not a general creditor as to these amounts. See Estes v. E.B. Estes & Sons, 24 F.2d 756 (D.Mass.1927).
 
 
 44
 Thus, the injunction should issue to prevent Hibernia's interference with the FDIC receiver and the depositor-borrower's right to make payments to the receiver. However, I would treat the participation as an assignment to Hibernia conveying ownership of a portion of the loan, and I would give Hibernia the right to offset amounts and to future payments in accordance with the analysis set forth above.
 
 
 
 [1]
 Hibernia suggests that the FDIC receiver is encouraging the depositors' use of setoff to decrease the amounts the FDIC must pay on insured deposits. In this preliminary injunction action we do not have before us whether the FDIC must make payments for the benefit of bank creditors on insured accounts that have been setoff against debts owed by the depositors, nor whether, if such payments must be made, Hibernia would have priority status as to FDIC payments representing amounts applied to Hibernia's share of the loans. We only need decide whether the FDIC receiver can be prevented from encouraging use of the setoffs. I agree with the majority that he cannot