**INTERFIRST BANK ABILENE, N.A.**
**Plaintiff-Appellee Cross-Appellant,**

v.

**FEDERAL DEPOSIT INSURANCE COR-PORATION, as Receiver of Ranchlander National Bank, Defendant-Appellant Cross-Appellee.**

No. 84–1840.

United States Court of Appeals,
Fifth Circuit.

Dec. 11, 1985.

Rehearing and Rehearing En Banc Denied Jan. 24, 1986.

Sharp & Morse, Austin, Tex., T. Ray Guy, Dallas, Tex., for defendant-appellant cross-appellee.

Johnson & Swanson, A. Erin Dwyer, Donald Colleluori, Dallas, Tex., for plaintiff-appellee cross-appellant.

Before CLARK, Chief Judge, and POLITZ and EDITH HOLLAN JONES, Circuit Judges.

EDITH HOLLAN JONES, Circuit Judge.

Caught in the toils of comprehensive factual stipulations made in the trial court, Federal Deposit Insurance Corporation (FDIC), as receiver of the Ranchlander National Bank of Melvin, Texas, nevertheless seeks to appeal the adverse finding that Interfirst Bank Abilene, N.A., was entitled to set off the balance held in Ranchlander's correspondent account with Interfirst at the date of its insolvency. Interfirst cross-appeals the denial of attorney's fees. We affirm the judgment of the district court.

## I. RANCHLANDER'S SAGA

This court has previously considered the antics of Orrin Shaid, Jr., the now-incarcerated " 'charismatic 300-pound east Texan,' " who ran Ranchlander from mid-1981 to its forced closing by the FDIC on November 19, 1982. *United States v. Shaid,* 730 F.2d 225, 227–29 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). One of several bank victims of Shaid's fraudulent scheme, which involved forged certificates of deposit and falsified loan documents and made use of a bank president who had no prior banking experience, was Interfirst Bank Abilene.

According to the parties' stipulations, Interfirst purchased participations in four Ranchlander loans between May and October, 1982. Interfirst's total commitment of $112,000 was paid by depositing the respective amounts of the participations into the correspondent checking account maintained by Ranchlander at Interfirst. Interfirst received certificates of participation from Ranchlander holding Ranchlander accountable for all payments of principal and interest made on each loan, but absolving Ranchlander from liability to Interfirst for its failure to make collections, or in general for any losses or expenses incurred by Interfirst by reason of each loan, "unless such losses or expenses are due to Ranchlander's fraud or gross negligence."

Fraud and gross negligence in the execution and administration of two of the four loans were stipulated by the parties. Among other things, Ranchlander forged the signature of one borrower, never obtained collateral for the loan, falsified inspection reports relating to the collateral, and delivered the proceeds of the loan to Orrin Shaid, who was not the borrower. The proceeds of another loan, ostensibly made to a third-party customer of Ranchlander, also ended up in Shaid's hands. Both the interest of Shaid and the nature and value of the collateral were misrepresented to Interfirst.

At the date of Ranchlander's insolvency, there was a balance of $25,994.99 in its correspondent account at Interfirst. That day, Interfirst credited to the account $35,008.99, representing Interfirst's repayment to Ranchlander of "federal funds" it had previously purchased from Ranchlander.

As the FDIC commenced its efforts to liquidate Ranchlander, it made demand on Interfirst for return of the $61,003.98 account balance, to which Interfirst responded by exercising a setoff. FDIC retaliated, refusing to disburse Interfirst's share (some $17,000) of the proceeds collected on two of the loans.

Interfirst filed suit seeking a declaratory judgment to approve the offset of Ranchlander's account as to two of the loans and to recover its $17,000 share of the proceeds collected on the other two loans. The district court's determinations followed a trial upon a somewhat more detailed stipulation of the above-recited facts. FDIC did not appeal the judgment requiring it to pay Interfirst's share of the collected proceeds and accumulated interest. Three issues are presented for review; the validity of the setoff exercised by Interfirst, possi-

ble estoppel of Interfirst to assert an offset, and the parties' claims for attorneys' fees.

## II. VALIDITY OF THE OFFSET BY INTERFIRST

■ As receiver of Ranchlander, FDIC is responsible to marshall the bank's assets and distribute them ratably "on all such claims as may have been proved to [the receiver's] satisfaction." 12 U.S.C. § 194. The allowance of such claims against the assets of an insolvent national bank is a matter of federal law. *FDIC v. Mademoiselle of California*, 379 F.2d 660, 662 (9th Cir.1967). The validity of Interfirst's setoff claim must comport with federal law, although it may be necessary to refer to state law for guiding principles. *See, e.g., American National Bank v. FDIC*, 710 F.2d 1528, 1534 n. 7 (11th Cir.1983).

■ FDIC contends that the Interfirst setoff effected a preference for that bank over other creditors of Ranchlander, in violation of 12 U.S.C. § 91, and undermined the requirement of ratable distribution to creditors, embodied in 12 U.S.C. § 194. To sustain these contentions, FDIC strains to distinguish *Scott v. Armstrong*, 146 U.S. 499, 510, 13 S.Ct. 148, 151, 36 L.Ed. 1059 (1892), which, as the district court stated, "long ago held that if a setoff is otherwise valid, it is not a preference in violation of the National Bank Act; only the balance of deposit over setoff is considered an asset of the receivership." *Interfirst Bank Abilene, N.A. v. FDIC*, 590 F.Supp. 1196, 1199 (W.D.Tex.1984). *See also First Empire Bank v. FDIC*, 572 F.2d 1361, 1367 (9th Cir.) (permitting setoff against obligations of failed bank on standby letters of credit), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); *Mademoiselle of California*, 379 F.2d at 663–64 (permitting setoff of deposits in an account with the failed bank against a promissory note due the bank). Aside from noting the factual differences between *Scott* and this case, FDIC's distinctions lie in a series of arguments denying the validity of the setoff made by Interfirst. Contrary to FDIC's position, which will be elaborated during this discussion, Interfirst did have a provable claim against FDIC, and it satisfied the test for a setoff.

■ A claim is provable against the FDIC as receiver if (1) it exists before the bank's insolvency and does not depend on any new contractual obligations arising later; (2) liability on the claim is absolute and certain in amount when suit is filed against the receiver; and (3) the claim is made in a timely manner, well before any distribution of the assets of the receivership other than a distribution through a purchase and assumption agreement. *First Empire*, 572 F.2d at 1367–69.

Both Interfirst's asserted grounds for its claim meet this test of provability. First, the participation certificates specifically absolved Ranchlander of liability unless "such losses or expenses be due to fraud or gross negligence on our part." FDIC stipulated fraud and gross negligence as to the loans at issue. It is difficult to conceive a clearer pre-insolvency breach of a contractual obligation, giving rise to a liquidated claim by Interfirst against Ranchlander.[1] Alternatively, Interfirst asserts rescission based on fraud. In *FDIC v. United States National Bank*, 685 F.2d 270, 276 (9th Cir.1982), a rescission based on fraud was held provable with the result that a defrauded subordinated noteholder of the bank was entitled to rescind a loan agreement and assert a claim against the receiv-

---

1. Ignoring the language quoted in the text above, FDIC launched a protracted argument in its brief requesting this court to enmesh itself in the arcane issues surrounding the construction of interbank participation arrangements: do they create debtor-creditor relationships, trust arrangements, assignments, etc. *See, e.g.,* Hutchins, *What Exactly Is a Loan Participation?,* 9 Rut.-Cam.L.J. 447 (1978); MacDonald, *Loan Participations as Enforceable Property Rights in Bankruptcy—A Reply to the Trustee's Attack,* 53 Am.Bankr.L.J. 35 (1979); Simpson, *Loan Participations: Pitfalls for Participants,* 31 Bus.Law. 1977 (1976); Stahl, *Loan Participations: Lead Insolvency and Participants' Rights (Part 1),* 94 Banking L.J. 882 (1977). Based on the specific language in the instant participation certificates, we avoid this problem.

er. *Id.* at 273. Interfirst's fraud claim also pre-dated Ranchlander's insolvency and was absolute in amount when Interfirst filed suit, as required by *First Empire,* 572 F.2d at 1369.

FDIC, in arguing that the rescission claim is not provable, cites only one case, *Continental Assurance Co. v. American Bankshares Corp.,* 540 F.Supp. 54, 60 (E.D.Wis.1982), which also concerned a claim by subordinated noteholders. That decision relied heavily on the district court's holding in *United States National Bank,* which was reversed by the Ninth Circuit on appeal. *United States National Bank,* 685 F.2d at 277. Otherwise, FDIC dwells at length upon the alleged inequity of permitting a rescission remedy to Interfirst. In the absence of record facts to support its claim of inequity, this contention amounts to untenable speculation. Further, there is no *a priori* reason for denying Interfirst, as a bank creditor, a remedy that would be available to any other creditor of Ranchlander who could establish the appropriate facts.

On either stated basis, as the district court held, Interfirst had a provable claim against FDIC in the amount of its participations in the two fraudulent loans. Thus, it was entitled to offset following Ranchlander's insolvency if there was "mutuality" of the obligations of Ranchlander and Interfirst. *See, e.g., Atkinson v. FDIC,* 635 F.2d 508, 510–11 (5th Cir.1981) (noting that FDIC can exercise offset in appropriate cases); *Kaufman v. First National Bank of Opp, Alabama,* 493 F.2d 1070, 1072 (5th Cir.1974); *United States v. Bank of Shelby,* 68 F.2d 538, 539 (5th Cir.1934); *Dallas/Fort Worth Airport Bank v. Dallas Bank & Trust Co.,* 667 S.W.2d 572, 575 (Tex.App.—Dallas 1984, no writ); *Cassidy Commission Co. v. Security State Bank,* 333 S.W.2d 454, 458–59 (Tex.Civ.App.—Houston 1960, no writ). "Mutuality" requires that the deposit of Ranchlander and its debt to Interfirst be owed in the same capacity so as to prevent such unjust results as an offset of a trust account to reduce the trustee's debt.

FDIC suggests three limitations on the otherwise clear right of Interfirst to offset under this formula: the failure of the proceeds of the Ranchlander account to be traceable exactly to Interfirst's investment in the loan participations; the alleged liability of Orrin Shaid alone for the fraud and gross negligence; and the "public policy" against awarding an offset to the bank. FDIC has failed to cite apposite authority for the first of these propositions. The second proposition is contradicted by the agreed factual stipulation, which repeatedly implicates Ranchlander and Jean Moon, the nominal bank president, as well as Orrin Shaid in the fraudulent acts.

The "public policy" arguments against setoffs fly in the face of *Scott* and its progeny which permit exercise of this remedy. The Supreme Court in *Scott* considered and rejected the argument that allowance of setoffs would conflict with the then-applicable statutory provisions invalidating preferential transfers to the creditors of an insolvent bank. Chief Justice Fuller stated, "We do not regard this position as tenable .... [L]iens, equities, or rights arising by express agreement, or implied from the nature of the dealings between the parties, or by operation of law, prior to insolvency and not in contemplation thereof, are not invalidated." 146 U.S. at 510, 13 S.Ct. at 151. His opinion garnered additional support from ancient and contemporary bankruptcy law which generally enforced offsets between a debtor and his creditors. *Id.* at 511, 13 S.Ct. at 151. The current Bankruptcy Code also enforces offsets under most circumstances. 11 U.S.C. § 553.

Notwithstanding the Supreme Court's broad endorsement of setoffs, FDIC contends that affording the remedy to Interfirst in this case will encourage big city banks to require ever-larger correspondent accounts as the price for participating in loans by small rural banks. Moreover, assured of the potential protection of setoffs, the "upstream" banks will be less likely to review loan participations thoroughly for indicia of fraud or lack of creditworthiness.

Surely the incremental effect of this decision, which relies upon century-old precedent, could not be so dramatic. As to its effect on creditmaking decisions by national banks, FDIC has informed the court, and should be consoled by the fact, that the Office of the Comptroller of the Currency, which regulates national banks, has recently promulgated detailed guidelines governing loan participations. *See* Banking Circular 181 (Rev.) Aug. 2, 1984, Fed.Banking L.Rep. (CCH) ¶ 60,799 at 38,859 (Dec. 19, 1983). To deprive Interfirst of its otherwise valid setoff right would up-end years of contrary understanding by banks and create disincentives for them to assist smaller banks in providing capital to local and rural enterprise.

It is true that one Ninth Circuit case, while acknowledging that *Scott* represents "the general rule permitting setoff," prevented the Bank of America from exercising that remedy as the holder of an unpaid subordinated capital note issued by a later-defunct Puerto Rican bank. *FDIC v. Bank of America National Trust & Savings Association*, 701 F.2d 831, 836 (9th Cir.), *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983). However that decision is not inconsistent with *Scott* as it actually furthered the policy of preventing preferential transfers to creditors. Bank of America had voluntarily subordinated the indebtedness owed to it, and allowance of setoff would have enhanced the bank's position at the expense of creditors with a higher priority. *Id.* at 835–39. Interfirst's offset here would not so abuse the priority scheme.

The district court correctly awarded declaratory judgment in favor of Interfirst regarding its offset against Ranchlander's correspondent account.

### III. THE "UNCLEAN HANDS" DEFENSE

For the first time on appeal, FDIC argues that Interfirst, through a series of judgmental and banking practice errors that prevented it from realizing it was the victim of fraud, had unclean hands and should not be allowed to offset. This contention arises out of the Supreme Court decision in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 460–62, 62 S.Ct. 676, 680–82, 86 L.Ed. 956 (1942), and requires proof that Interfirst and Ranchlander were involved in a scheme jointly to defraud Ranchlander's creditors or a scheme that would have that effect. The agreed statement of facts in the district court did not contain any evidence favorable to this theory, and FDIC consequently sought to amend the record in this court to add a considerable body of new evidence. The motion to supplement was denied.

We do not choose to ignore the stipulated record and serve as the *nisi prius* court for this issue. In formulating the stipulations to be used at the trial court, FDIC's counsel represented that he "believes the foregoing stipulations encompass all factual issues that are relevant and material to a decision of the present action, apart from the amount of the reasonable attorneys' fees." Having made such a representation, FDIC is bound by it. *See Donovan v. Hamm's Drive Inn*, 661 F.2d 316, 317 (5th Cir.1981).

We further decline to entertain FDIC's newly raised argument based on *D'Oench, Duhme* because it does not involve a pure legal question and our failure to consider it would not result in a miscarriage of justice. *See Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1117 n. 20 (5th Cir.1985); *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1549 (5th Cir.1984); *United States v. Community Science Technology, Inc.*, 574 F.2d 1292, 1296 (5th Cir.1978); *Higginbotham v. Ford Motor Co.*, 540 F.2d 762, 768 n. 10 (5th Cir.1976).

### IV. ATTORNEYS' FEES

Having held for Interfirst on the merits of its claims, the district court declined to award attorneys' fees. Interfirst seeks attorneys' fees only with regard to FDIC's withholding of Interfirst's $17,000 share of the proceeds on two of the loans.

Interfirst analogizes its position with respect to the collected loan proceeds to that of a secured creditor, the value of whose collateral is sufficient to pay off principal

and interest owed to that creditor. *Ticonic National Bank v. Sprague,* 303 U.S. 406, 413, 58 S.Ct. 612, 615, 82 L.Ed. 926 (1938), authorized a secured creditor to recover interest in that situation. *Ticonic* is different from the present case. First, the creditor there held a statutory lien on the fund from which interest would be paid. *Id.* at 412-13, 58 S.Ct. at 614-15. Second, that collateral fund, rather than the bank's general assets, which must be ratably distributed to creditors, was the sole source of payment of interest. *Id.*

*Ticonic's* cloth cannot be cut to fit Interfirst's suit. Interfirst is not a secured creditor with regard to the proceeds held by FDIC. Its only right, assured in the participation certificate with Ranchlander, is to receive its pro rata share of all payments of principal and interest received by Ranchlander for application on the indebtedness. Nothing in that contract nor in applicable law creates a security interest on behalf of Interfirst to allow recovery of attorneys' fees out of other participants' pro rated shares of the proceeds.

▓▓▓ Moreover, the claimed attorneys' fees run afoul of the requirement that the assets of a failed bank be ratably distributed among the bank's creditors holding approved or adjudicated claims. 12 U.S.C. § 194. *See Fash v. First National Bank of Alva, Oklahoma,* 89 F.2d 110, 112 (10th Cir.1937); *Citizen's Bank & Trust Co. v. Thornton,* 174 F. 752, 762-64 (5th Cir. 1909). *Ticonic* held that payment of interest to a secured creditor out of the fund that constituted his collateral did not violate this precept. Since Interfirst does not hold a security interest, its attorneys' fees would perforce be paid at the expense of the bank's other creditors from a fund otherwise available to all of them. Further, it is doubtful that Interfirst's claim for attorneys' fees is "provable" under the *First*

*Empire* test previously cited. *See* 572 F.2d at 1367-69. The claim did not exist prior to Ranchlander's insolvency, as there was no mention of attorneys' fees in the participation certificates with Interfirst. Attorneys' fees were not fixed and certain in amount when suit was filed against FDIC. The claim fails two of the three applicable tests. We thus conclude that where recovery of attorneys' fees is not specified in the parties' contract or where there is no collateral fund from which they can be recovered, a claim for attorneys' fees cannot be asserted against the assets of a failed bank.[2]

Interfirst must be content with its offset and recovery of its pro rata share of the proceeds collected on the loans. For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**2.** Both FDIC and Interfirst assumed that state law would determine whether attorneys' fees could constitute a provable claim in this case. We have found no support for this specific proposition, although the merits of claims against failed banks may be determined by reference to state law in the absence of controlling federal statute or rule of decision. *American National*

*Bank,* 710 F.2d at 1535 & n. 7 (11th Cir.1983). In this limited instance, however, where the only basis for attorneys' fees is the Texas catch-all statute awarding them in contract cases, see Tex. Rev.Civ.Stat.Ann. art. 2226, we find that enforcement of the federal statute requiring ratable distribution precludes this increment to Interfirst's claim.